Filed 4/8/25

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B325167 |
|     Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA457195) |
|     v. | |
| ROBERT HINOJOS, | |
|     Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappé, Judge. Affirmed.

        Benjamin Owens, under appointment by the Court of Appeal; Marvin E. Vallejo for Defendant and Appellant.

        Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

---

\*     Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion parts C and D.

_____

Robert Hinojos appeals from a judgment of conviction after a jury found him guilty of first degree murder and found true the special circumstance that he committed the murder by shooting from a motor vehicle.  On appeal, Hinojos contends the trial court erred in sustaining the prosecution's objection to defense counsel's use of a peremptory challenge to a prospective juror, by admitting excessive gang evidence at trial, and by excluding certain proposed expert testimony.  He also argues the special circumstance of murder by shooting from a motor vehicle is unconstitutional.

In the published portion of this opinion, we address Hinojos's argument that the trial court erred in sustaining the prosecution's objection under Code of Civil Procedure section 231.7,[1] which provides a statutory prohibition to a party's use of a peremptory challenge based on a prospective juror's race or perceived race.  As a matter of first impression, we determine the trial court's sustaining of a section 231.7 objection raises a mixed question of law and fact, which we review de novo, deferring to factual findings if supported by substantial evidence. Applying that standard, we conclude the trial court did not err.

We also address, in the published portion, Hinojos's contention that the trial court abused its discretion in admitting certain gang evidence at trial.  Trial was bifurcated under Penal Code section 1109 on gang enhancement and gang-murder special circumstance allegations, but evidence about the Mexican Mafia was also admissible and relevant to prove motive in the

_____

[1]      Undesignated statutory references are to the Code of Civil Procedure.

2

murder phase of trial. The prosecution's theory was that Hinojos killed Hector Velasquez to fulfill a condition to become a Mexican Mafia member. Although Hinojos maintains too much gang evidence was admitted, we discern no abuse of discretion.

In the unpublished portion of this opinion, we uphold the trial court's exclusion of the expert testimony and reaffirm that the drive-by murder special circumstance does not violate the Eighth Amendment.

Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.      *The Day Before the Shooting, Hinojos Talks About the Prospect of a "Promotion" If He Completes a Task*

On May 12, 2016, the day before the shooting, Hinojos talked to his girlfriend, Tricia Tafolla, on the telephone. Because Tafolla was in custody at the time, the telephone call was recorded. Hinojos and Tafolla spoke in coded language, which was interpreted by the prosecution's gang expert. Hinojos told Tafolla that he was working "real hard" to achieve a "promotion," which the expert opined referred to Hinojos's desire to move up the gang hierarchy from a member of a Southern California street gang to a "made man" of the Mexican Mafia. In order to earn the promotion, Hinojos had to complete a task and needed to do it "a little bit quicker." Hinojos conveyed to Tafolla that he was having trouble getting in contact with someone he wanted to "take on a date," which the expert explained meant to kill the person. Hinojos also confirmed his mother was aware of his potential promotion.

3

B.    *The Next Day, Hinojos Shoots and Kills Velasquez from a Car*

On May 13, 2016, the next morning, Hinojos went to a diner to meet with Velasquez, Juan Acosta, and others. According to Acosta, the group had gathered that morning to discuss a drug debt owed by Mario Chavarria, also known as "Snaps." Velasquez had sold Chavarria drugs, and Acosta had been assisting Velasquez in trying to collect payment. Acosta did not know Hinojos. When Chavarria could not be reached and did not show up for the meeting, the group finished its food and went looking for Chavarria on a street near where Chavarria lived.[2]

When Acosta reached the agreed-upon street, Velasquez directed him to park his car. Acosta sat in his SUV, rolling a marijuana cigarette while he waited. Acosta saw Hinojos drive around a bit and then stop in the middle of the street near where Velasquez was standing. Velasquez approached Hinojos's car and leaned towards the front passenger-side window, which was open. Acosta then heard three or four gunshots, saw Velasquez collapse, and realized Hinojos had shot him. Hinojos immediately drove away.

Acosta drove up to Velasquez, who asked to be taken to the hospital and said, "He shot me." Acosta understood Velasquez was referring to Hinojos. Velasquez was able to climb into Acosta's SUV without assistance. Acosta drove Velasquez to a nearby hospital and arrived a few minutes after the shooting.

Law enforcement arrived at the hospital moments later. Sheriff's deputies found Velasquez in the front passenger seat of

---

[2]    Video surveillance showed Hinojos and the other men arriving, gathering, and departing from the diner.

4

Acosta's SUV and observed him with a gunshot wound to the chest. Velasquez told one of the deputies, "Help me, please. I've been shot. I don't want to die." The deputy tried to help Velasquez maintain consciousness by talking to him. Velasquez told the deputy that he had been shot by a bald, Hispanic man, 30 to 35 years old, with extensive tattoos and that the shooter drove a black Chrysler 300 with black rims. His description matched Hinojos and his car. Velasquez went on to say "he shot me from the car" and confirmed that no one else was in the car with Hinojos. After losing consciousness, Velasquez was taken in an ambulance to another hospital and died shortly thereafter.

Law enforcement found an expended bullet in the crease of the front passenger seat where Velasquez was sitting. The bullet was from either a .38 special or a .357 magnum revolver. Later investigation turned up five expended nine-millimeter casings on the same street where Velasquez was shot and that a car parked on the street had been struck by gunfire. The five casings had been fired from the same gun. There were also two lead fragments, likely from bullets, that were not of sufficient quality to determine caliber or other useful information.[3]

---

[3] Cellular phone location data were consistent with Hinojos's being at the diner, driving to the scene of the shooting, and leaving the scene of the shooting. Phone data also indicated that, while at the diner, Hinojos attempted to contact Chavarria. Phone location data were also consistent with Acosta's being at the diner and the scene of the shooting, as well as with Velasquez's being at those locations and attempting to contact Chavarria.

5

C.     *A Few Hours After the Shooting, Hinojos's Mother Discusses How Hinojos Got "Promoted" and Was Lying Low*

A few hours after the shooting, Tafolla called Hinojos's mother. Tafolla indicated that she was unable to reach Hinojos. Hinojos's mother explained to Tafolla that Hinojos "got that promotion, so he's gonna be offline for, like, a week." Hinojos's mother reiterated, "he barely got promoted today" and would not be answering his phone. The prosecution's gang expert opined that going "offline" was to avoid law enforcement detection and that Hinojos's mother appeared to be under the mistaken impression that Hinojos was made a Mexican Mafia member immediately after completing his assignment to kill Velasquez.

D.     *Three Days After the Shooting, Hinojos Confirms He Completed His Task and His Bosses Were Pleased but the Official "Promotion" Could Take Several More Months*

On May 16, 2016, three days after the shooting, Tafolla called Hinojos. She asked Hinojos whether "congratulations" were in order. He responded that he "finished the project [him]self" and was just waiting for the "paperwork, basically, to be filed." He suggested it might not be final for several more months. Tafolla expressed surprise throughout the call because she had understood from Hinojos's mother that Hinojos had already received the "promotion." Hinojos reassured her that "the project's done" and "they liked it," and that he assumed his mother had simply "misunderstood." He reiterated that "[t]hey just had to wait for the paperwork." According to the prosecution's gang expert, Hinojos's statements confirmed that he committed the killing himself and that he was just waiting for

6

the Mexican Mafia members to vote on his membership, which the expert confirmed could take several months.

E.     *A Detective Interviews Hinojos and Tells Him Law Enforcement Found His Car, Asks Him About Chavarria, and Mentions the Possibility of a Witness Who Can Identify Him*

Months later, on October 26, 2016, law enforcement located the black Chrysler that Hinojos drove on the day of the shooting. The car was registered to Patricia Aragon, another of Hinojos's girlfriends (or possibly his wife), with whom Hinojos had lived. Law enforcement searched the car and found Hinojos's wallet and a large amount of marijuana. Gunshot residue was also found inside the car near the front passenger-side door. This was consistent with a gun having been fired nearby. A search of homes connected to Hinojos turned up $10,000 in cash and a box of .38-caliber ammunition, consistent with the type of bullet found in the SUV near Velasquez after the shooting. Hinojos was arrested the same day on an unrelated arrest warrant.

On November 15, 2016, a couple weeks later, a detective interviewed Hinojos. During the interview, the detective asked Hinojos about the black Chrysler. He also asked, "How do you know Snaps [Chavarria]?" and "What if I told you somebody can point you out?"

That same evening, Hinojos talked to his cellmate, a Mexican Mafia member. The conversation was recorded. Hinojos asked, "How long do you think gun powder will stay on like, on a seat or something like that?" When the cellmate answered that he thought it had to be tested "immediately," Hinojos replied,

7

"they're trying to say since May"—i.e., the month in which the shooting took place.

F.  *Hinojos Discusses the Possibility Chavarria Is Cooperating with Law Enforcement, and Chavarria Is Killed the Same Day*

On November 20, 2016, Aragon visited Hinojos in custody. During the visit, Hinojos told Aragon about the meeting with the detective, including that law enforcement had impounded her black Chrysler and believed it was used in a murder. He also conveyed that there was an eyewitness who could identify him.

Aragon left and came back the same day. Apparently unaware they were being video recorded (and not just audio recorded), the two communicated by silently mouthing words and using hand gestures. The prosecution's gang expert again interpreted the conversation. Aragon gestured with her hand to indicate talking and then snapped her fingers—the combination of gestures suggested she believed "Snaps" (i.e., Chavarria) had been cooperating with the police. She also became upset and made vague comments seemingly indicating she had warned Hinojos that Chavarria would speak to the police and that Hinojos would get arrested. Aragon wrapped up the discussion saying she would "get over it," following up with, "Will be today. I guarantee it."

The gang expert opined that although a layperson might believe Aragon and Hinojos had been discussing common personal relationship issues, they were actually discussing Aragon's belief that Chavarria was an informant, how she was upset Hinojos had not agreed with her on the point, and that she would "take care" of the problem by the end of the day.

8

That same day, Chavarria was killed, and the next day, Aragon conveyed the fact to Hinojos, again through code.

Following Chavarria's killing, Hinojos and his cellmate had several discussions, which were recorded and audible despite their whispering. Over the course of a few weeks, Hinojos and his cellmate discussed how Chavarria's death was a good development for Hinojos, how Hinojos would soon learn what evidence law enforcement had against him for Velasquez's killing, whether there was a "rat," and the possibility of pinning the homicide on the deceased Chavarria.

G.      *Hinojos Becomes a Member of the Mexican Mafia*

Ultimately, Hinojos became a made member of the Mexican Mafia. This was confirmed by gang expert analysis of later conversations and Hinojos's particular gang tattoos.

H.      *Charges, Trial, Verdict, and Sentence*

The People charged Hinojos with murder (Pen. Code, § 187, subd. (a)) and possession of a firearm as a felon (Pen. Code, § 29800, subd. (a)(1)). As to the murder charge, the People alleged special circumstances that the murder was carried out by shooting from a motor vehicle (Pen. Code, § 190.2, subd. (a)(21)) and to further the activities of a criminal street gang (Pen. Code, § 190.2, subd. (a)(22)), and further alleged that Hinojos personally used and intentionally discharged a firearm causing death (Pen. Code, § 12022.53, subds. (b)–(d)). The People alleged both crimes were also committed for the benefit of, at the direction of, or in association with a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1)(A).) Finally, the People alleged Hinojos previously had been convicted of an offense qualifying as

9

a serious-felony enhancement (Pen. Code, § 667, subd. (a)(1)) and strike (Pen. Code, §§ 667, 1170.12).

Trial on the gang enhancement and gang-murder special circumstance allegations was bifurcated from trial on the substantive offenses and other allegations.

Following a jury trial, Hinojos was found guilty of first degree murder and possession of a firearm by a felon. The jury found true the special circumstance that the murder was carried out by shooting from a motor vehicle and the allegation that Hinojos personally discharged a firearm causing death. The jury also found true that Hinojos had previously been convicted of a serious felony and strike offense. The prosecution elected not to proceed to trial on the gang enhancement or gang-murder special circumstance allegations.

The trial court sentenced Hinojos to life in prison without the possibility of parole, plus 25 years to life for the firearm enhancement, plus a determinate term of five years for the prior serious felony conviction.

Hinojos timely appealed.

## DISCUSSION

A.  *The Trial Court Did Not Err in Sustaining the Prosecution's Section 231.7 Objection to Defense Counsel's Use of a Peremptory Challenge*

Hinojos contends the trial court erred in sustaining the prosecution's section 231.7 objection to his counsel's use of a peremptory challenge to a White prospective juror. Section 231.7 prohibits a party from using a peremptory challenge to remove a prospective juror based on the prospective juror's race or

perceived race, among other protected categories. As a threshold matter, we determine that the sustaining of a section 231.7 objection to the use of a peremptory challenge presents a mixed question of law and fact. We therefore review de novo the ultimate question of whether "in light of the totality of the circumstances . . . there is a substantial likelihood that an objectively reasonable person would view race [or perceived race] . . . as a factor in the use of the peremptory challenge" (§ 231.7, subd. (d)(1)), deferring to the trial court's factual findings if supported by substantial evidence. Applying this standard, we conclude the trial court did not err in sustaining the section 231.7 objection.[4]

### 1. *Voir Dire and the Section 231.7 Ruling*

Voir dire was conducted in groups. Juror No. 10,[5] the juror at issue here, was part of the second group of prospective jurors. In response to defense counsel's question about the prosecution's burden to prove the case beyond a reasonable doubt, Juror No. 10 indicated he was satisfied with that rule and agreed with it. He later stated, "I do believe that we must presume someone innocent." When defense counsel asked whether anyone had

---

[4]     In his opening brief, Hinojos argued the trial court misapplied the statute in finding unconscious or implied bias in the case of a White juror because the statute was designed to address discrimination in excluding non-White potential jurors. In his reply brief, and at oral argument, Hinojos abandoned this argument.

[5]     At the time, he was Prospective Juror No. 1. He was later Prospective Juror No. 10 and then seated as Juror No. 10. For ease of discussion, we refer to him as Juror No. 10.

thoughts about Hinojos's having "a bald head" and "tattoos," Juror No. 10 responded that he had "no thoughts regarding that" and the only idea he had about Hinojos was "that that's an innocent man." Defense counsel asked whether the prospective jurors would have issues trusting witnesses, and Juror No. 10 said he "d[id]n't have any issues with trusting witness testimony . . . . [I]f someone is going to be swearing an oath, [he] then would trust them." If someone had lied to him before, the effect "depends on the new scenario and whether or not . . . [the person is] stating that it's truthful and [whether] there's consequences with it not being so."

Following a few days of voir dire of several groups of prospective jurors, the trial court heard challenges for cause and then seated 20 of the remaining prospective jurors in order from one to 20. The court next entertained peremptory challenges of the first 12 prospective jurors outside their presence. The prosecution accepted the panel as constituted. Defense counsel began exercising peremptory challenges.

After defense counsel's second peremptory challenge, the prosecution objected, indicating counsel had exercised both peremptory challenges to dismiss Hispanic[6] males. The court overruled the objection, which the prosecutor also attempted to withdraw. Defense counsel exercised several more peremptory challenges. On his seventh peremptory, the prosecutor objected. She noted this was the fourth peremptory challenge the defense had used on a White person. Defense counsel explained that he

_____

[6] We use the term "Hispanic" because that is the term the parties used most often in the trial court, although the parties and the court also sometimes used the term "Latino" interchangeably.

12

was exercising the peremptory challenge because the prospective juror had a nephew in law enforcement and counsel did "very little voir dire on gangs in this particular group." The court expressed confusion over the latter reason but overruled the objection.

Thereafter, defense counsel challenged Juror No. 10, and the prosecutor objected, indicating that it was "another White juror." Defense counsel said he thought Juror No. 10 was Hispanic and pointed out that he had a Hispanic-sounding name. Counsel explained he exercised the peremptory challenge because he did not conduct "enough gang voir dire" of the juror. Defense counsel explained that, because trial on the gang allegations was bifurcated, he "made a strategic decision" to ask fewer questions about gangs during voir dire of the earlier groups, such as the one of which Juror No. 10 was a part. Counsel then changed his mind after consulting with colleagues and decided "to basically go all-out relating to gang voir dire" thereafter. The court explained that the "problem" with counsel's explanation is counsel could then "sit here and not do any voir dire and kick everybody on the panel." The court indicated it did not hear any valid race-neutral reasons for the exercise of the peremptory challenge.

At defense counsel's request, the trial court allowed counsel to review the voir dire transcript and his notes over the lunch recess. Defense counsel reported back the details of his voir dire of Juror No. 10, noting he received "rather satisfactory answers," he had some positive notes about the juror, and he had "put a star next to his name, which . . . [is] . . . code for that's a good juror." Counsel further explained that his notes indicated "MH," which meant "male Hispanic" but he had a question mark next to the "H." He seemed to accept that Juror No. 10 could be White.

13

Defense counsel explained that he asked questions about Hinojos's bald head and tattoos, but "did not go heavily into gangs." Ultimately, counsel confirmed that the "only reason" he exercised the peremptory challenge against Juror No. 10 was because he had not asked him enough questions about gangs.

Before ruling, the trial court made several observations. First, the court noted defense counsel had challenged a number of both White and Hispanic jurors. Second, the statute incorporated acts of implied bias and did not require a finding that the reason given for the challenge was pretextual. Third, defense counsel's written note indicated Juror No. 10's responses suggested he would be a good juror. Fourth, the court appeared to agree with the prosecutor that defense counsel had engaged in a pattern regarding his use of peremptory challenges and seemed unconvinced by counsel's attempt to differentiate based on whether the juror was White or Hispanic.[7]

The trial court sustained the prosecutor's section 231.7 objection. The court determined that race, ethnicity, or national origin "bear on the facts of the case to be tried" because it was a "case revolving around Mexican Mafia membership." It further found that defense counsel "failed to question the prospective juror about the concerns later stated . . . as the reason for the peremptory challenge," further noting that defense counsel was "turning that [factor] on its head and using that as a justification."

Additionally, the trial court found defense counsel's questioning of the challenged juror was "cursory." Specifically,

---

[7] After jury selection was completed, defense counsel conducted internet research and discovered the juror might be "mixed Latino and White."

the court explained that the "presumption of innocence" and the "beyond a reasonable doubt" burden of proof "are two very simple questions that the court itself talked to the juror about at length." Moreover, "[a]s far as questioning about the case itself, [defense counsel] talked about tattoos and bald head, and that ties into the gang thing."

The court also reviewed Juror No. 10's questionnaire,[8] which revealed a "White banker who gave no remarkable answers to any questions that would raise a suspicion as to anything that would take him off the jury."

The court concluded:

"To state that your failure to question would justify exercise [of] a peremptory challenge leaves me no other conclusion than it was done for race, whether conscious or subconscious or implied. . . .

"I do make the finding that there is a substantial likelihood an objectively reasonable person would view race or perceived membership of that race, specifically White, for the use of the peremptory challenge, and I am sustaining the objection.

"And I just point out, if you did it knowing the person was Hispanic, you have taken off a number of Hispanics, too.

"But this is a peremptory that's got no justification in this court's mind, and the court does find that it's an improper exercise of a peremptory."

As a remedy, the court seated Juror No. 10 on the jury.

Hinojos filed a petition for writ of mandate and immediate stay, which this court denied in case No. B318881.

_____

[8]     The juror questionnaires are not part of the appellate record.

2. *The Legal Background on Objections to Putatively Impermissible Peremptory Challenges and the Framework of Section 231.7*

The use of peremptory challenges to strike prospective jurors because of their race is prohibited by our state and federal Constitutions. (*Batson v. Kentucky* (1986) 476 U.S. 79, 88 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258, 276–277 (*Wheeler*), overruled on other grounds in *Johnson v. California* (2005) 545 U.S. 162 (*Johnson*); see also *Georgia v. McCollum* (1992) 505 U.S. 42, 59 [use of race in the exercise of preemptory challenges is constitutionally prohibited for both the prosecution and the defense].)

To evaluate a party's constitutional objection to an opposing party's exercise of a peremptory challenge purportedly based on race, trial courts engage in a three-step procedure: first, the objecting party must make out a prima facie case "'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose'"; second, if the objecting party makes a prima facie showing, the "'burden shifts'" to the party seeking to exercise the peremptory challenge "'to explain adequately the racial exclusion'" by offering permissible race-neutral justifications for the strikes; and third, if the party offers a race-neutral explanation, the trial court then decides whether the objecting party has proven purposeful discrimination. (*Johnson, supra,* 545 U.S. at p. 168, quoting *Batson, supra,* 476 U.S. at pp. 93–94; see also *People v. Sattiewhite* (2014) 59 Cal.4th 446, 469.)

Having found the *Batson*/*Wheeler* procedure ineffective in eliminating the discriminatory exclusion of potential jurors, the Legislature passed Assembly Bill No. 3070 (2019–2020 Reg.

16

Sess.), effective January 1, 2021. (Stats. 2020, ch. 318, § 1, subd. (b) ["The Legislature . . . finds that the existing procedure for determining whether a peremptory challenge was exercised on the basis of a legally impermissible reason has failed to eliminate . . . discrimination. In particular, the Legislature finds that requiring proof of intentional bias renders the procedure ineffective . . . "].) The law added section 231.7, which sets forth a different set of procedures for addressing statutory objections to peremptory challenges.[9]

Under these procedures, as pertinent here, "[a] party . . . may object to the improper use of a peremptory challenge" based on a "prospective juror's race" or "perceived" race. (§ 231.7, subds. (a) & (b).) In contrast to the three-step *Batson*/*Wheeler* procedure, under section 231.7, there is no requirement that the objecting party first make a showing of purposeful discrimination. (*People v. Jaime* (2023) 91 Cal.App.5th 941, 943.) Rather, "upon objection . . . , the party exercising the peremptory challenge *shall* state the reasons the peremptory challenge has been exercised." (§ 231.7, subd. (c), italics added.)[10] The trial court "shall evaluate the reasons given

[9] Although effective January 1, 2021, section 231.7 applies to criminal trials in which jury selection began on or after January 1, 2022. (§ 231.7, subd. (i).) It will apply to civil trials beginning on January 1, 2026. (§ 231.7, subds. (k) & (n); Stats. 2020, ch. 318, § 3.)

[10] The statute provides a list of presumptively invalid reasons for exercising a peremptory challenge. (§ 231.7, subd. (e).) When one of those reasons is given, a different procedure is triggered. Because this case does not involve a presumptively invalid reason under section 231.7, subdivision (e), we do not discuss that portion of the procedural framework.

17

to justify the peremptory challenge in light of the totality of the circumstances." (*Id.*, subd. (d)(1).) In doing so, "[t]he court shall consider only the reasons actually given and shall not speculate on, or assume the existence of, other possible justifications for the use of the peremptory challenge." (*Ibid.*)

Unlike in the *Batson*/*Wheeler* analysis, the ultimate question for the trial court is not whether the party exercising the peremptory challenge engaged in "purposeful discrimination." (Compare § 231.7, subd. (d)(1) ["The court need not find purposeful discrimination to sustain the objection"] with *Johnson*, *supra*, 545 U.S. at p. 168 ["[T]he trial court must . . . decide . . . whether the opponent of the strike has proved purposeful racial discrimination"].) Instead, the trial court shall sustain the objection to the use of the peremptory challenge "[i]f the court determines there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).)

An "objectively reasonable person" is defined as one who is "aware that unconscious bias, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in the State of California." (§ 231.7, subd. (d)(2)(A).) "'[S]ubstantial likelihood'" means "more than a mere possibility but less than a standard of more likely than not." (*Id.*, subd. (d)(2)(B).) The statute also provides a nonexhaustive list of circumstances the trial court may consider in making its determination. (*Id.*, subd. (d)(3).)

If the trial court finds the standard met and sustains the objection, the court must take one or more actions prescribed by

18

statute, which include "[s]eat[ing] the challenged juror." (§ 231.7, subd. (h)(3).)

### 3. *The Standard of Review When the Trial Court Sustains a Section 231.7 Objection*

We must first identify the standard of review for trial court decisions to sustain section 231.7 objections. Section 231.7, subdivision (j), provides: "The *denial* of an objection made under this section shall be reviewed by the appellate court de novo, with the trial court's express factual findings reviewed for substantial evidence." (Italics added.) The statute does not set forth a standard of review for a trial court's decision to *sustain* a section 231.7 objection, and to our knowledge no court has yet addressed this issue. (See *People v. Caparrotta* (2024) 103 Cal.App.5th 874, 887 ["No opinion has specifically discussed the standard of review that should apply" when the trial court sustains a section 231.7 objection].) Nonetheless, applying traditional principles of appellate review, we determine that the sustaining of a section 231.7 objection is also reviewed de novo, deferring to the trial court's factual findings if supported by substantial evidence.[11]

---

[11] We make two observations about the standard of review we articulate:

First, courts have sometimes drawn a distinction between "independent review" and "de novo review." (See *People v. Vivar* (2021) 11 Cal.5th 510, 527 ["When courts engage in independent review, they should be mindful that "'[i]ndependent review is *not* the equivalent of de novo review"']; see also *Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 514, fn. 31 ["The independent review function is not equivalent to a '*de novo*'

As the California Supreme Court has observed:

"The standards of review for questions of pure fact and pure law are well developed and settled. Trial courts and juries are better situated to resolve questions of fact, while appellate courts are more competent to resolve questions of law.

---

review of the ultimate judgment itself, in which a reviewing court makes an original appraisal of all the evidence"].) Where, as here, we defer to the trial court's factual findings if supported by substantial evidence, such review is generally described as "independent review." (See *In re George T.* (2004) 33 Cal.4th 620, 634 [when an appellate court defers to the trial court's factual findings while "exercis[ing] its independent judgment to determine whether the facts satisfy the rule of law," this is "independent" rather than "de novo" review].) Nevertheless, we use the term "de novo" for the sake of consistency with section 231.7, subdivision (j), which uses the term "de novo" for review of denials of section 231.7 objections, while also requiring deference to the trial court's factual findings. Indeed, "independent review" and "de novo review" are often used interchangeably. (See, e.g., *Salve Regina College v. Russell* (1991) 499 U.S. 225, 231–233 [using the terms "*de novo* review," "plenary review," and "independent review" interchangeably]; *People v. Waidla* (2000) 22 Cal.4th 690, 748 [describing the standard of review as "independent or de novo"].)

Second, section 231.7, subdivision (j), directs reviewing courts to defer only to the trial court's "express" factual findings in reviewing denials of section 231.7 objections. This is a deviation from traditional substantial evidence review, in which we defer to both "express and implied findings of fact if supported by substantial evidence." (*People v. Tacardon* (2022) 14 Cal.5th 235, 242.) We do not consider any implied findings in resolving Hinojos's claim on appeal and therefore do not reach the question of whether appellate courts may defer to implied factual findings in reviewing the sustaining of a section 231.7 objection.

Traditionally, therefore, an appellate court reviews findings of fact under a deferential standard (substantial evidence under California law, clearly erroneous under federal law), but it reviews determinations of law under a nondeferential standard, which is independent or de novo review.  [Citation.]

"Selecting the proper standard of appellate review becomes more difficult when the trial court determination under review resolves a mixed question of law and fact.  Mixed questions are those in which the "'historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated.'" [Citations]."  (*People v. Cromer* (2001) 24 Cal.4th 889, 893–894 (*Cromer*).)

The decision to sustain a section 231.7 objection presents a mixed question of law and fact on appellate review.

Section 231.7 begins with fact gathering.  The trial court must hear "the reasons given to justify the peremptory challenge" and evaluate those reasons "in light of the totality of the circumstances."  (§ 231.7, subd. (d)(1).)  The "circumstances" inquiry here focuses on the nature of the case, the parties, and—importantly—the voir dire proceedings.  Because the trial court is in the best position to gather historical facts and to assess credibility based on tone, demeanor, and conduct during voir dire proceedings, we defer to its findings if supported by substantial evidence.  (See *People v. Johnson* (2022) 12 Cal.5th 544, 618 ["[T]he trial court that has conducted voir dire has the unique benefit of observing a prospective juror's credibility, tone, attitude, and demeanor"]; *People v. Lenix* (2008) 44 Cal.4th 602, 614 (*Lenix*) [trial court evaluates "credibility and demeanor" of

21

attorneys and prospective jurors during voir dire]; see also *People v. Majors* (1998) 18 Cal.4th 385, 417 [when reviewing for juror misconduct, credibility determinations and findings on questions of historical fact are subject to substantial evidence review]; *People v. Jones* (1998) 17 Cal.4th 279, 296 [when reviewing the voluntariness of confession, the details of interrogation are subject to substantial evidence review]; *People v. Alvarez* (1996) 14 Cal.4th 155, 182 [when reviewing the denial of a motion to suppress, the court's findings on historical fact are reviewed for substantial evidence]; *People v. Reneaux* (2020) 50 Cal.App.5th 852, 863–864, citing *Cromer*, *supra*, 24 Cal.4th at p. 900 [when reviewing the prosecution's failed efforts to locate a missing witness, historical facts are subject to substantial evidence review].)

The ultimate question of whether "in light of the totality of the circumstances . . . there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge" (§ 231.7, subd. (d)(1)) is an application of a legal standard to facts. Where, as here, a "question requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles, then the concerns of judicial administration will favor the appellate court, and the question should be classified as one of law and reviewed de novo" or under "independent review." (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800–801.)

De novo (or independent) review on this question is consistent with other contexts where facts, once established, must be assessed in light of the totality of circumstances in a fundamentally law-driven analysis. (See *Thompson v. Keohane* (1995) 516 U.S. 99, 102 [independent review applies to whether

under the totality of the circumstances a suspect is "in custody" and therefore entitled to *Miranda* warnings]; *Miller v. Fenton* (1985) 474 U.S. 104, 117 [independent review applies to "whether, under the totality of the circumstances, [a] confession was obtained in a manner consistent with the Constitution"]; *People v. Kennedy* (2005) 36 Cal.4th 595, 608, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459 [independent review applies to the claim that identification procedure was unduly suggestive and unreliable under the totality of circumstances]; *People v. Moore* (2021) 64 Cal.App.5th 291, 296–297, citing *Ornelas v. United States* (1996) 517 U.S. 690, 697 [independent review applies to determinations of whether, under the totality of the circumstances, probable cause exists to make a warrantless search or seizure].)

We recognize this is a departure from the deferential standard applied on *Batson*/*Wheeler* review. (See *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1159 ["When a reviewing court addresses the trial court's ruling on a *Batson*/*Wheeler* motion, it ordinarily reviews the issue for substantial evidence"]; *Lenix*, *supra*, 44 Cal.4th at pp. 613–614 ["So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal"].) But the difference in review standard is dictated by the distinct nature of each inquiry. Under *Batson*/*Wheeler*, the ultimate question is factual—i.e., whether the attorney's proffer of subjective race-neutral reasons for exercising the peremptory challenge *was* "sincere," and whether the party objecting to the use of the peremptory challenge sustained its burden of showing "'from all the circumstances of the case'" a strong likelihood that the challenge

23

*was* exercised on "improper grounds." (*People v. Reynoso* (2003) 31 Cal.4th 903, 924.)

By contrast, the ultimate question under section 231.7, subdivision (d)(1), is whether there is a "substantial likelihood that an objectively reasonable person would view [an improper ground] as a factor in the use of the peremptory challenge." Section 231.7 is therefore concerned with the likelihood the peremptory challenge could be viewed as motivated by an improper ground (i.e., a legal standard) rather than whether the peremptory challenge actually was motivated by an improper ground (i.e., a factual question). (See § 231.7, subd. (d)(1) ["The court need not find purposeful discrimination to sustain the objection"].)

In sum, the sustaining of a section 231.7 objection presents a mixed question of law and fact. Accordingly, we review de novo the ultimate legal question of whether "in light of the totality of the circumstances . . . there is a substantial likelihood that an objectively reasonable person would view race [or perceived race] . . . as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).) We defer, however, to the trial court's factual findings if supported by substantial evidence.[12]

---

[12] Because this case does not involve a presumptively invalid reason for exercising a peremptory challenge governed by section 231.7, subdivisions (e), (f), and (g), we express no view on the standard of review that would apply there.

4. *The Trial Court Correctly Concluded There Was "More Than a Mere Possibility" an "Objectively Reasonable Person" Would View Race as "a Factor in the Use of the Peremptory Challenge"*

Applying the standard of review set forth above, we conclude "in light of the totality of the circumstances . . . there is a substantial likelihood that an objectively reasonable person would view race [or perceived race] . . . as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).)

Defense counsel's sole reason for seeking to remove Juror No. 10 was counsel's failure to ask this prospective juror about his views on gangs during voir dire. Statutory factors to consider in assessing the totality of the circumstances include "[t]he number and types of questions posed to the prospective juror, including, but not limited to . . . [c]onsideration of whether the party exercising the peremptory challenge failed to question the prospective juror about the concerns later stated by the party as the reason for the peremptory challenge" and "[w]hether the party exercising the peremptory challenge engaged in cursory questioning of the challenged potential juror." (§ 231.7, subd. (d)(3)(C)(i) & (ii).)

Hinojos contends his attorney's questioning of Juror No. 10 was not "cursory" and that his attorney did not "fail[] to question [Juror No. 10] about the concerns later stated . . . as the reason for the peremptory challenge." (§ 231.7, subd. (d)(3)(C)(i) & (ii).) Specifically, he argues his attorney asked Juror No. 10 several questions, but just did not ask him about his view on gangs. According to Hinojos, his attorney did not justify his exercise of the peremptory challenge based on his concern about Juror No. 10's views on gangs but rather his concern about not knowing

25

what Juror No. 10's views on gangs were. For these reasons, he maintains the trial court's determination under section 231.7, subdivision (d)(3)(C), about the "number and types of questions posed" to Juror No. 10 was incorrect. We agree with the trial court's assessment.

The factors relating to the "number and types of questions posed" under section 231.7, subdivision (d)(3)(C), originate from case law. It has long been established that "[a] failure to engage in meaningful voir dire on a subject of purported concern can, in some circumstances, be circumstantial evidence suggesting the stated concern is pretextual." (*People v. Lomax* (2010) 49 Cal.4th 530, 573; accord, *Miller–El v. Dretke* (2005) 545 U.S. 231, 244–245; *People v. Lewis* (2008) 43 Cal.4th 415, 476, disapproved on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919; *People v. Huggins* (2006) 38 Cal.4th 175, 233–235; see also *Wheeler*, *supra*, 22 Cal.3d at p. 281 ["failure . . . to engage . . . jurors in more than desultory voir dire, or indeed to ask them any questions at all" can be inferential evidence that the peremptory challenge is motivated by improper bias].) Defense counsel's failing to question Juror No. 10 about his views on gangs, and then offering lack of knowledge about Juror No. 10's views on gangs as the sole reason for the exercise of the peremptory challenge, raises the inference that the reason was pretextual. Importantly, the question under section 231.7 is not whether defense counsel's reason actually was a pretext to cover for purposeful discrimination based on race, but instead whether "in light of the totality of the circumstances . . . there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge." (§ 231.7, subd. (d)(1).) We determine there is.

As the trial court observed, defense counsel's notes indicated Juror No. 10 was "a good juror" who gave "rather satisfactory answers." For example, Juror No. 10 expressed agreement with the duty to apply a presumption of innocence and, when asked about Hinojos's "bald head" and "tattoos," indicated he had "no thoughts regarding that" and the only idea he had about Hinojos was "that that's an innocent man." The trial court saw nothing the defense would find objectionable in Juror No. 10's questionnaire, and defense counsel identified nothing either. In addition, the trial court observed that defense counsel had excluded "a number" of White (and Hispanic) jurors before reaching Juror No. 10, and defense counsel did not dispute this finding. On these facts, the trial court was correct that "in light of the totality of the circumstances" there is "more than a mere possibility" that "an objectively reasonable person would view race [or perceived race] . . . as a factor in the use of the peremptory challenge." (§ 231.7, subds. (d)(1) & (d)(2)(B).)

Accordingly, we uphold the trial court's sustaining of the prosecutor's objection under section 231.7.

B. *The Trial Court Did Not Abuse Its Discretion in Admitting the Prosecution's Gang Evidence at Trial*

Hinojos argues that, although gang evidence was admissible to prove motive for murder, some of the evidence should have been excluded. We find no abuse of discretion.

1. *The Trial Court's Ruling on the Admission of Gang Evidence and the Gang Expert's Testimony*

Before trial, Hinojos sought to bifurcate trial on the gang enhancement (Pen. Code, § 186.22, subd. (b)(1)(C)) and the gang-

murder special circumstance (Pen. Code, § 190.2, subd. (a)(22)) allegations. The trial court granted this request under Penal Code section 1109. Hinojos then moved to exclude all gang evidence during the initial phase of trial on the murder charge, arguing that the evidence was speculative, irrelevant, and likely to inflame the jury. The trial court ruled that gang evidence was admissible under Evidence Code section 1101, subdivision (b), because it was highly relevant to motive, intent, and other potential issues in the case.

In trying to "reconcile the two statutes" (i.e., Penal Code section 1109 and Evidence Code section 1101), the court directed the prosecution to avoid eliciting evidence concerning whether the Mexican Mafia qualified as a gang and the elements of the gang allegations, and to instead focus on evidence concerning Hinojos's desire to become a Mexican Mafia member. The court concluded admission of the gang evidence in the murder trial was a question under Evidence Code section 352 and found that gang evidence admitted for this purpose was not unduly prejudicial.[13]

At trial, Rene Enriquez, a former Mexican Mafia member, testified as the prosecution's gang expert. Enriquez explained

---

[13] During the prosecution's presentation of gang expert testimony, Hinojos's trial counsel objected, noting that the "gang stuff ha[d] been bifurcated" and asking "how much leeway" the court was going to give the People to present evidence about the Mexican Mafia. The court reiterated its ruling that the People were not permitted to go into the formal elements of the gang allegations, but the evidence about the structure of the Mexican Mafia was admissible because the People's theory was that Hinojos's "motive was to rise and get promoted in the gang" and this "all [wa]s necessary to understand that."

28

that the Mexican Mafia was a criminal organization consisting of approximately 150 members.  Those members were mostly in custody and recruited from Southern California Hispanic street gangs.  Mexican Mafia members were superior to street gangs in hierarchy, and the small number of Mexican Mafia members directed the actions of thousands of street gang members, thereby controlling territory throughout Southern California.  The Mexican Mafia made money through drug sales and asserted control by directing deadly violence.

To become a Mexican Mafia member, one has to attract a sponsor's attention by committing violent crimes on the gang's behalf and demonstrating strong business and people skills.  Membership was determined by a vote among Mexican Mafia members, and the approval of a new member commonly involved a lengthy political process.

Much of Enriquez's testimony was devoted to decoding several audio and video recordings, wherein gang code was used to hide the substance of the communications.  Enriquez testified that gang code was commonly used in the Southern California Hispanic gang culture and in the Mexican Mafia to avoid detection by law enforcement.  Going through the communications one by one, Enriquez explained how Hinojos and others had discussed Hinojos's need to kill someone to be inducted into the Mexican Mafia, how he reported having fulfilled the obligation and was hopeful he would become a member of the Mexican Mafia within several months, and how he ultimately became a full member of the Mexican Mafia.  Enriquez also decoded discussions in which Hinojos conveyed how Chavarria might be cooperating with law enforcement and in which Aragon relayed that Chavarria was killed.

Finally, Enriquez testified that Hinojos had tattoos that indicated membership in the Mexican Mafia. Having such tattoos without being a made member of the Mexican Mafia was unlikely because it was punishable by death.[14]

## 2. *The Law on the Admission of Gang Evidence and the Standard of Review*

California courts have long been circumspect in the admission of gang evidence in criminal trials. Such evidence "creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (See *People v. Williams* (1997) 16 Cal.4th 153, 193 (*Williams*).) The admission of gang evidence was historically more complicated when the prosecution also alleged gang enhancements—i.e., that the defendant committed the charged offense "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members." (Pen. Code, § 186.22, subds. (b) & (d).) Recognizing that "[g]ang enhancement evidence can be unreliable and prejudicial to a jury because it is lumped into evidence of the underlying charges," the Legislature addressed the issue as part of Assembly Bill No. 333 (2021–2022 Reg. Sess.), known as the STEP Forward Act of 2021. (Stats. 2021, ch. 699, § 2, subd. (d)(6).) Specifically, the Act "added [Penal Code] section 1109, which provides that, if

---

[14] Hinojos also called a gang expert. According to his gang expert, the communications were not about murder, the Mexican Mafia disfavored drive-by shootings, and one could become a member of the Mexican Mafia without committing violent felonies.

requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense." (*People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*), citing Pen. Code, § 1109, subd. (a) and Stats. 2021, ch. 699, § 5.)

Notwithstanding Penal Code section 1109, however, "in some instances, the same gang evidence introduced to establish the elements of a gang enhancement might be admissible at a bifurcated trial on the underlying charge." (*Burgos*, *supra*, 16 Cal.5th at p. 23.) Indeed, "evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see also *People v. Chhoun* (2021) 11 Cal.5th 1, 31 ["The People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense"].)

Even when relevant, "[u]nder Evidence Code section 352, the trial court may . . . exclude gang evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. The decision on whether gang evidence is relevant and not unduly prejudicial rests within the broad discretion of the trial court." (*People v. Garcia* (2024) 107 Cal.App.5th 1040, 1050 (*Garcia*).) Accordingly, we must not disturb the trial court's exercise of discretion "except on a showing that the court exercised its discretion in an arbitrary, capricious or patently

31

absurd manner that resulted in a manifest miscarriage of justice." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 225, italics omitted.)

> 3. *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence of Hinojos's Motive*

The trial court bifurcated the trial on the substantive murder charge from the gang enhancement and the gang-murder special circumstance allegations. It nonetheless allowed testimony from a gang expert during the substantive phase of trial in furtherance of the People's theory of motive—namely that Hinojos committed the murder to elevate his status from that of a lower-level Hispanic street gang member to a full-fledged Mexican Mafia member. Hinojos "does not dispute that some evidence related to the Mexican Mafia was relevant to the question of motive." Rather, he contends "the sheer volume of evidence far exceeded what was necessary," identifying a handful of statements he believes went too far.[15] We address each in turn.

First, Hinojos takes issue with Enriquez's statement that the Mexican Mafia controls 50,000 gang members in Southern California. In his view, this implied the Mexican Mafia was responsible for all the criminal activity of those gang members and, presumably, unduly prejudiced Hinojos because that criminality would be unfairly imputed to him. This testimony,

---

[15] The People argue Hinojos forfeited this argument by failing to specifically object to these statements in the trial court. Because we find no abuse of discretion in the admission of the evidence, we assume, without deciding, that Hinojos's arguments are preserved on appeal.

however, was highly relevant to the People's theory of motive. It helped establish the foundation for their contention that the Mexican Mafia sat at the top of the hierarchy, which explained why Hinojos, as an undisputed member of a criminal street gang, would view induction into the Mexican Mafia as a promotion in the system.

Second, Hinojos contends that Enriquez "also testified, in so many words, that the Mexican Mafia was in the murder business." It is true that in describing the Mexican Mafia's organization and structure, Enriquez mentioned its activities of extortion, drug distribution, assault, and murder. Yet it is hard to imagine the jury would have been surprised to hear that the Mexican Mafia engages in these activities. Hinojos notably does not contend that Enriquez described these activities with any level of specificity or detail, which might have unduly prejudiced the jury.

Third, Hinojos points to Enriquez's admission that he killed four people at the behest of the Mexican Mafia. According to Hinojos, Enriquez "did not claim that he was made a member in exchange for one of these killings" and "[t]hus, it was not directly relevant to the prosecution's theory that [Hinojos]'s membership was a quid pro quo for the murder." We read the record differently. This is the exchange:

> "[Prosecutor]: And then in terms of the point at which you got made, how is it that you actually achieved that goal?
> [Enriquez]: How did I end up being made?
> [Prosecutor]: Yes, yes. Did you have to commit a particular crime in addition to the grooming process?
> [Enriquez]: Yeah. I had stabbed four individuals before that."

Contrary to Hinojos's assertion, Enriquez was offering his personal killings in explaining the process by which he became a member of the Mexican Mafia. The brief colloquy was relevant not only to help establish Enriquez's credibility as an expert but also to advance the idea that willingness to commit murder is a criterion used by the Mexican Mafia in evaluating a person for membership.

Fourth, and finally, Hinojos identifies a line in the transcript where Enriquez says that "[t]he organization comes first, even if that means you have to kill a family member." There was no evidence in this case that any Mexican Mafia member or Hinojos killed a family member. Rather, the purpose of the statement was to explain the importance of loyalty to the organization. While the point could have been conveyed without that specific flourish, we cannot say it was so unduly prejudicially as to outweigh its probative value.

In conclusion, the People's gang evidence was relevant to Hinojos's motive for murder and was therefore admissible in the first phase of trial. (See *People v. Valdez* (2012) 55 Cal.4th 82, 129–131 [evidence of defendant's membership and level of commitment to a gang, allegiance to the Mexican Mafia, and the workings and activities of the gang was admissible as relevant to motive and identity]; *Williams*, *supra*, 16 Cal.4th at pp. 193–194 [evidence of defendant's leadership role in a gang, rivalry with another gang, and the gang's behavior and areas of influence was admissible as relevant to prove motive].) Much of the gang expert's testimony was also dedicated to deciphering gang code in various communications, which Hinojos does not challenge. Accordingly, given the highly probative value of the gang evidence to the People's theory of motive and to understanding

the coded communications in this case, the trial court acted within its discretion in finding that the probative value of the gang evidence was not substantially outweighed by the risk of undue prejudice. (Cf. *Garcia, supra*, 107 Cal.App.5th at p. 1054 [trial court abused its discretion in admitting gang evidence in first phase of bifurcated Penal Code section 1109 trial where the gang evidence was "inflammatory and prejudicial" and "largely irrelevant" to any trial issue].)

C.      *The Trial Court Did Not Abuse Its Discretion or Violate Hinojos's Right to Due Process by Excluding Some Expert Testimony*

Hinojos argues the trial court erred in limiting the testimony of one of his experts (Dr. Hammers) and in excluding the testimony of another (Dr. Firestone). As we explain below, we determine the trial court did not abuse its discretion. We also conclude the trial court's rulings did not violate Hinojos's due process right to present a defense.

1.      *The Trial Court Acted Within Its Discretion To Limit Dr. Hammers's Testimony and To Exclude Dr. Firestone's*

A person is qualified to testify as an expert if the person has sufficient special knowledge, skill, experience, training, or education on the subject to which the testimony relates. (Evid. Code, § 720, subd. (a).) An expert's testimony in the form of an opinion is limited to matters "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Even when proposed expert testimony meets this

35

standard, a trial court still may exclude the testimony "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See Evid. Code, § 352; see also *People v. Alcala* (1992) 4 Cal.4th 742, 788 (*Alcala*) [even where proffered testimony satisfies the Evidence Code requirements for expert testimony, a trial court could still exclude the testimony under Evidence Code section 352].)

"'The trial court has broad discretion in deciding whether to admit or exclude expert testimony, and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion.'" (*People v. Anh The Duong* (2020) 10 Cal.5th 36, 60, quoting *People v. McDowell* (2012) 54 Cal.4th 395, 426, citation omitted.)

### a. *The Trial Court Was Within Its Discretion To Limit Dr. Hammers's Expert Testimony to Her Areas of Expertise*

The defense sought to call Dr. Hammers, a forensic pathologist, to testify at trial. The purpose of her testimony was to cast doubt on the probability that Hinojos shot Velasquez from inside the car while Velasquez was leaning into the passenger-side window. While her proposed testimony included matters squarely within the purview of forensic pathology—namely that the physical evidence showed the bullet entered and exited Velasquez's body perpendicularly rather than at an angle—it also relied on her review of witness statements and police reports, a bullet path trajectory analysis, ballistic evidence, and her view of the gunshot residue analysis.

36

The trial court acted within its discretion to permit Dr. Hammers to testify as to matters related to forensic pathology but to exclude Dr. Hammers's proposed testimony beyond that. During a hearing regarding the permissible scope of her testimony, Dr. Hammers acknowledged she was a trained forensic pathologist who worked for years as a medical examiner; she was not an expert in bullet path trajectory, ballistics, or criminology. While she attended some seminars that touched on those latter subject matters, they were not part of her expertise. Dr. Hammers further acknowledged medical examiners, like her, do not make assessments beyond the scope of what can be ascertained from the decedent's body alone. This was confirmed by Dr. Odey Ukpo, the official medical examiner in the case, who testified that determining a shooter's location relative to a victim or a bullet's trajectory before striking the body required expertise in ballistics, bullet trajectory, and gunshot residue—subject matters outside a forensic pathologist's domain.

Hinojos contends "the trial court severely limited Dr. Hammers'[s] testimony to no more than basically regurgitating what was in the autopsy report, and to no more than what the prosecution's medical examiner witness had already testified." Not so. Dr. Hammers testified the evidence showed the difference in height between the entrance and exit wounds was "closer to a three to four-inch difference rather than a once-inch difference" as Dr. Ukpo had calculated. She further disagreed with Dr. Ukpo's assessment that the bullet perforated a rib bone and changed direction within the body, noting that any mention of deflection was oddly absent from Dr. Ukpo's report and that, in her experience, the bullet would travel on a straight path. Dr. Hammers also testified that the nature of the wound

37

indicated the bullet entered perpendicularly to Velasquez's body, and the bullet's path through the body revealed certain positions that Velasquez could have been in when he was shot. She went on to summarize, "Basically the body has to be facing the bullet so that it can enter perpendicular, but then the body would need to be bent in a way that allows the bullet to travel downward as opposed to just going from the front to the back of the body." In other words, Dr. Hammers was ultimately permitted to opine on what the bullet's entry angle showed regarding how Velasquez's body might have been positioned when he was shot—which was the reason the defense sought to introduce her testimony in the first place.

Finally, Hinojos cites three cases—*People v. Edwards* (2013) 57 Cal.4th 658, *People v. Robinson* (2005) 37 Cal.4th 592, and *People v. Catlin* (2001) 26 Cal.4th 81—to argue that Dr. Hammers's excluded testimony was proper subject matter for a forensic pathologist. These cases do not assist him. In each of those cases, the reviewing court was tasked with deciding whether the trial court abused its discretion in *admitting* testimony not in *excluding* it. The trial court's broad discretion in admitting or excluding evidence means that on the same facts one judge could reasonably exclude evidence that another judge could reasonably admit. "We do not consider whether a trial court reasonably could have admitted the expert opinion evidence in this case. Our only inquiry . . . is whether the trial court's decision to exclude the expert opinion testimony constituted an abuse of discretion." (*People v. McDowell* (2012) 54 Cal.4th 395, 428, fn. 22, citing *Alcala, supra,* 4 Cal.4th at pp. 788–789.) We conclude it did not.

38

b.   *The Trial Court Acted Within Its Discretion To Exclude Dr. Firestone's Proposed Testimony*

Hinojos argues Dr. Firestone, a physicist, would have testified that (1) for Hinojos, from inside the car, to shoot Velasquez, standing at the passenger-side window, Hinojos "would have had to hold the firearm in an extremely awkward manner, such as very high up within the vehicle, pointed in a very acute downward[] angle, which was not a likely scenario"; and (2) "given the amount of evidence that he believed was missing, whether not report[ed], collected or obtained, it was not possible for him to determine how the shooting took place in this case" and "the physical evidence he reviewed in this case . . . was not sufficient to establish that the shooting occurred from within a vehicle at a victim that was positioned outside of the vehicle in some fashion." We discuss each in turn and conclude the trial court was within its discretion to exclude this proffered testimony.

With respect to Dr. Firestone's proposed testimony about the unlikelihood that the shooter fired from inside the car, this was based entirely on the location of two bullet fragments found at the scene—one in the road; the other in a driveway. Based on his calculations of bullet trajectory, Dr. Firestone concluded that the bullet fragment found in the road was in a place that "didn't fit any scenario" where it could have been fired from inside the car. While the bullet fragment in the driveway could have been fired from inside the car, it would have required the firearm to have been held up high pointing downward, which "doesn't make any sense" because it is the "most extreme way" to shoot.

The problem with this opinion is that no one claimed either bullet fragment came from Hinojos's firearm. Although there

39

was never a satisfactory explanation of the details, the evidence showed that there were likely other firearms discharged at the scene. Even the defense's firearm examiner stated that "[t]he amorphous lead fragments recovered from the scene . . . could not be associated with any other evidence recovered at that location[;] its [*sic*] source remains ambiguous." And, importantly, the People's position was that Velasquez was killed by the bullet found in the passenger seat of Acosta's SUV, where law enforcement discovered Velasquez sitting wounded. Dr. Firestone's opinion that unaccounted-for bullet fragments found at the scene were not likely fired from inside the car was of minimal, if any, probative value.

Similarly, Dr. Firestone's proposed testimony about how, in his view, physical evidence was missing and therefore inconclusive would not have assisted the jury. Dr. Firestone observed that given the number of cartridges or casings found at the scene, additional bullets should have been recovered; "[i]f those bullets were found, that would tell [him] something about the angle where they originated from." In the trial court's view, the proposed testimony would have been unhelpful to the jury and merely invited speculation as to why there was missing evidence. Absent any suggestion that law enforcement willfully suppressed evidence, the prosecution is not required to call all witnesses or to produce all physical evidence that might be relevant. (See *People v. Tuthill* (1947) 31 Cal.2d 92, 97–98, disapproved on another ground in *People v. Balderas* (1985) 41 Cal.3d 144, 182 ["There is no compulsion on the prosecution to call any particular witness or to make any particular tests so long as there is fairly presented to the court the material evidence bearing upon the charge for which the defendant is on trial"]; see

40

also *People v. Noisey* (1968) 265 Cal.App.2d 543, 549 ["failure to investigate and develop evidence" is not the same as "wil[l]ful suppression of evidence which, it is well established, constitutes a denial of a fair trial and of due process"].) The trial court correctly assessed that the proposed testimony risked confusing the jury and invited undue speculation.

Moreover, because the People's case was not dependent on physical evidence, Dr. Firestone's opinion that the physical evidence alone did not conclusively establish how the shooting occurred was of minimal relevance, because it had little "tendency in reason to prove or disprove any disputed fact that [was] of consequence to the determination of the action." (Evid. Code, § 210.) There was no dispute that there was a mismatch in the number of cartridges or casings versus bullets found at the scene, or that the bullet trajectory or ballistics evidence was inconclusive on its own.

Accordingly, the trial court acted within its discretion in determining that the probative value of Dr. Firestone's proposed testimony was substantially outweighed by the probability that its admission would create "substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

> 2. *The Trial Court Did Not Violate Hinojos's Due Process Right To Present a Defense*

Hinojos further argues that the trial court's exclusion of expert testimony, even if not an abuse of discretion, nonetheless violated his due process right to present his defense. "'As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a

41

defense.'" (*People v. Turner* (2020) 10 Cal.5th 786, 818, quoting *People v. Hall* (1986) 41 Cal.3d 826, 834.)  Indeed, "[o]nly rarely" is "the right to present a complete defense . . . violated by the exclusion of defense evidence under a state rule of evidence." (*Nevada v. Jackson* (2013) 569 U.S. 505, 509.)  This is not one of those rare cases.

Here, the limitations on Dr. Hammers's testimony and the exclusion of Dr. Firestone's testimony did not deprive Hinojos of an opportunity to present his defense.  On the contrary, Hinojos presented a robust defense in which he marshalled an array of experts to cast doubt on the prosecution's evidence that Hinojos was the shooter.  As discussed, Dr. Hammers testified about the probable path of the bullet and position of Velasquez's body. Additionally, a criminalist testified that there was no blood on the expended bullet that matched Hinojos's ammunition and was found in the seat where Velasquez sat after he was shot.  A forensic consultant testified that the gunshot residue found on Hinojos's car was not of a forensically significant amount.  A firearm examiner opined, based on the location of the nine-millimeter casings and other measurements, that there was gunfire at the scene from a weapon other than the one that fired the .38 or .357 caliber bullet found near Velasquez.  Hinojos further presented a gang expert to counter the prosecution's gang expert, a cellphone tower expert to dispute the prosecution's cellphone analysis, and a psychologist to cast doubt on eyewitness testimony by explaining the problems with memory and suggestibility.

All in all, we cannot say that the trial court's decision to limit Dr. Hammers's testimony and to exclude Dr. Firestone's

testimony deprived Hinojos of his due process right to present a complete defense.

D.  *The Drive-by Murder Special Circumstance Does Not Violate the Eighth Amendment*

Finally, Hinojos challenges his sentence to life without the possibility of parole based on the drive-by murder special circumstance. (Pen. Code, § 190.2, subd. (a)(21).) Specifically, he contends the special circumstance violates the Eighth Amendment, under which a valid death penalty statute must provide an objective basis for delineating the types of murders that warrant the death penalty. In his view, this requirement also applies to cases, like his, where the defendant is sentenced to life without the possibility of parole rather than death.

As Hinojos acknowledges, *People v. Rodriguez* (1998) 66 Cal.App.4th 157 addressed the same arguments. The *Rodriguez* court rejected overbreadth, facial invalidity, and as-applied challenges—in each instance upholding the constitutionality of the statute. (*Id.* at pp. 171–181.) We believe *Rodriguez* was correctly decided and decline to revisit the issue here.

43

## DISPOSITION

The judgment is affirmed.


PULOS, J.*

We concur:



SEGAL, Acting P. J.



FEUER, J.

---

*     Judge of the San Diego County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

44